UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

TIMOTHY DURLEY,

                    Plaintiff,

    v.                                       Case No. 21-cv-822-pp

KAREN STREEKSTRA, DANIEL BOUSHKA
and ANGELA DAVIS,

                    Defendants.

---

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 26), DENYING PLAINTIFF'S MOTIONS FOR SANCTIONS (DKT. NOS. 46, 60, 64) AND DISMISSING CASE**

---

Plaintiff Timothy Durley, who is representing himself, is proceeding under 42 U.S.C. §1983 on an Eighth Amendment claim against officials at Waupun Correctional Institution. The defendants have moved for summary judgment. Dkt. No. 26. The plaintiff opposes the motion and moves for sanctions against the defendants. Dkt. Nos. 46, 60, 64. The court will deny the plaintiff's motions for sanctions, grant the defendants' motion for summary judgment and dismiss the case.

I.    **Facts**

    A.    <u>Procedural Background</u>

On July 7, 2021, the court received the plaintiff's complaint, asserting that Waupun staff had given the plaintiff food items containing peanut butter, even though he has a known peanut allergy. Dkt. No. 1. The plaintiff alleged that on June 14, 2021, he needed medical care after consuming some of the

items. Id. at 3. The court screened the complaint and determined that it did not allege that any named defendant "personally disregarded [the plaintiff's] special diet and gave him or allowed him to receive foods containing peanuts." Dkt. No. 7 at 6. The court gave the plaintiff an opportunity to amend his complaint to "allege who was personally involved in putting the peanut-containing foods on his tray or allowing the foods to be served to him, despite knowing about his severe allergy." Id.

On June 8, 2022, the court received the plaintiff's amended complaint, which raised the same allegations as the original complaint but named as defendants Karen Streekstra (misidentified as "Karan Streekster"), Daniel Boushka (misidentified as "Daniels Boushka") and Angela Davis. Dkt. No. 8. The court screened the amended complaint and allowed the plaintiff to proceed on a claim that the defendants knew about the plaintiff's peanut allergy when preparing his meal trays and snack bags, yet on one occasion on June 14, 2021, he received peanut-containing items. Dkt. No. 11 at 6. The court opined that it was "a close question whether the amended complaint sufficiently states a deliberate indifference claim" because the plaintiff did not allege "that any defendant deliberately placed items containing peanuts or peanut butter in his bag." Id. at 6–7. The court explained that it was "possible that the incident on June 14, 2021 was an accident—the result of negligence," which would not state an Eighth Amendment claim. Id. at 7. Nonetheless, the court construed the amended complaint liberally, stating that "if a defendant knows of a plaintiff's severe peanut allergy but 'blows off' his concerns and makes his

snack bag the same way he or she makes any other incarcerated person's snack bag, a jury could conclude that that person was deliberately indifferent to a severe risk to the plaintiff." Id. The court allowed the plaintiff to proceed on a claim "that the defendants were aware of, but were deliberately indifferent to, the plaintiff's severe peanut allergy." Id. at 8.

On December 29, 2022, the court issued a scheduling order setting a June 29, 2023 deadline for the parties to file dispositive motions. Dkt. No. 15. At the deadline, the defendants filed their motion for summary judgment. Dkt. No. 26. The court ordered the plaintiff to file his response to the motion by the end of the day on July 31, 2023. Dkt. No. 33. The court later granted the plaintiff's motion for an extension of that deadline, ordering him to file his response materials by August 30, 2023. Dkt. No. 36. The court denied the plaintiff's motion to file an oversized response brief, explaining that the plaintiff had "not provided sufficient explanation as to why he cannot limit his response to the thirty pages allowed by Civil Local Rule 56(b)(8)." Id. The court denied the plaintiff's second motion to file an oversized brief, explaining "that the thirty-page limit applies only to [the plaintiff's] brief/memorandum in opposition to the defendants' motion for summary judgment" and "does not apply to his response to the defendants' proposed findings of fact or his other response materials." Dkt. No. 38.

On August 14, 2023, the court granted the plaintiff's second motion for an extension of time, ordering him to file his response materials by October 31, 2023. Dkt. No. 41. The court recounted that the plaintiff had said he needed

this extension because "he [would] be in and out of Waupun Correctional Institution (where he is housed) for court days in each of the next four months, that he [was] waiting for papers from his institution and that he ha[d] upcoming deadlines in several civil cases." Id. The court denied the plaintiff's motion to reconsider allowing him to file a response brief exceeding thirty pages. Dkt. No. 42.

On September 15, 2023, the court issued an order in response to the plaintiff's letters expressing concerns about his attempts to e-file his response materials. Dkt. No. 43. The court provided additional explanation about why it had denied the plaintiff's requests to file an oversized brief and detailed the plaintiff's obligation to respond to the defendants' arguments in their motion for summary judgment. Id. at 3–5. The court reported that the librarian at Waupun had contacted the court because the plaintiff had attempted to file between 500 and 550 pages of materials. Id. at 5. The librarian also informed the court "that many of the items the plaintiff submitted could not be scanned for e-filing, either because they were stapled, or were taped, or were used food packets stuck to sheets of paper." Id. The librarian returned the materials to the plaintiff, who simply sent them back to the library to be e-filed without correcting the issues that had prevented e-filing in the first place. Id. The court advised the plaintiff that when e-filing his materials, he "must provide the documents he wants to have e-filed to the staff at his institution in a form that allows them to be scanned and e-filed. He must provide those documents in a form that complies with institution rules and policies." Id. at 6. The court

expressed "concerns about the number of pages of documents the plaintiff appears to have submitted for e-filing" and advised the plaintiff to consider filing only those documents necessary for the court's decision on the defendants' motion for summary judgment. Id. at 6–8.

Five days later, on September 20, 2023, the court received a 311-page packet of documents from the plaintiff. Dkt. No. 45. The 311 pages does not include a response to the defendants' motion for summary judgment or to their proposed findings of fact; it is made up of variously labeled exhibits and declarations. On September 25, 2023, the court received the plaintiff's first motion for sanctions. Dkt. No. 46. The plaintiff also filed a document asking the court notify him when it received his materials in response to the defendants' motion for summary judgment. Dkt. No. 47.

On October 16, 2023, the defendants filed a motion for leave to file an additional declaration from defendant Streekstra in support of their motion for summary judgment. Dkt. No. 49. The court granted that motion despite the plaintiff's opposition, finding that the plaintiff would "not be prejudiced by the court considering the declaration; the defendants forwarded the declaration to him on October 16, 2023." Dkt. No. 58. The court also extended the plaintiff's deadline to file his response to the defendants' motion for summary judgment to November 13, 2023, "in order that he may incorporate any response to defendant Streekstra's declaration in his opposition brief." Id.

On November 6, 2023, the court received the plaintiff's second motion for sanctions, dkt. no. 60, a motion for an extension of time, dkt. no. 61, and a

motion for a hearing, dkt. no. 62. The court denied the plaintiff's motions for an extension of time and for a hearing, reiterating that the plaintiff's brief and other materials in opposition to defendants' motion for summary judgment remained due by end of day on November 13, 2023 and that failure to file by deadline meant that the court would treat the defendants' motion as unopposed. Dkt. No. 63 at 9. On November 9, 2023, the court received the plaintiff's third motion for sanctions, which is a duplicate of his second motion for sanctions. Dkt. No. 64. At the November 13, 2023 deadline, the court received the plaintiff's materials in response to the defendants' motion for summary judgment. Dkt. Nos. 66–71. The defendants' motion for summary judgment and the plaintiff's motions for sanctions are fully briefed.

      B.    <u>Factual Background</u>

          1.    *The Amended Complaint*

      The plaintiff filed his amended complaint on the court's form for incarcerated persons proceeding without an attorney. Dkt. No. 8. The plaintiff signed the amended complaint and "declare[d] under penalty of perjury that" its contents are "true and correct." <u>Id.</u> at 8. The court treats the verified amended complaint as "the equivalent of an affidavit for purposes of summary judgment, because it 'contains factual allegations that if included in an affidavit or deposition would be considered evidence, and not merely assertion.'" <u>Beal v. Beller</u>, 847 F.3d 897, 901 (7th Cir. 2017) (quoting <u>Ford v. Wilson</u>, 90 F.3d 245, 246 (7th Cir. 1996)).

The court detailed the amended complaint's allegations in the second screening order. Dkt. No. 11. The amended complaint alleges that on April 4, 2021, the plaintiff wrote to Streekstra because he received peanut-containing items in a snack bag. Id. at 3. Streekstra told the plaintiff "that she would 'be real stric[t] with [his] snack bag and be on lookout' for peanut-containing items." Id. (quoting Dkt. No. 8 at 3). But the plaintiff continued to receive peanut-containing items in his snack bag. Id. He wrote to Davis and Boushka about the issue "because, he says, their 'job is to observe the "FSU" line and to make sure the food is rightly fixed and also "assist" in making trays and "snack bags.""" Id. at 3–4. Davis and Boushka assured the plaintiff that they, too, "'[would] check [the plaintiff's] snack bag to make sure no peanut butter is in [his] snack bag and that all "FSU" chef's including "Ms Streekster" ha[ve] been informed meaning "made aware" to daily check [his] snack bag.'" Id. at 4. On June 14, 2021, the plaintiff received a peanut butter cookie in his snack bag, which he says Streekstra had prepared. Id. The plaintiff suffered an allergic reaction to the cookie, which he says "almost killed him." Id. A nurse provided the plaintiff "nebulizer treatment and an allergy pill because the plaintiff's 'throat was swelling and [he] was having [a] hard time breathing.'" Id. The plaintiff alleged that all three defendants continued to personally prepare his snack bags, and the bags continued to contain peanut butter or peanut-containing items. Id.

2. *Defendant's Proposed Facts*

   a. The Parties

The plaintiff was incarcerated at Waupun at all relevant times. Dkt. No. 28 at ¶1. Defendant Streekstra has been employed as a Corrections Food Service Leader at Waupun since February 26, 2017. Id. at ¶2. Streekstra avers that a Food Service Leader serves under the supervision of Food Service Management. Dkt. No. 50 at ¶3. Streekstra is responsible for preparing, cooking and serving meals on her assigned shift. Id. She also is the lead worker to all corrections Food Service Leaders ranked below her on that shift, and she trains incarcerated workers and staff. Id.

Defendant Boushka was a Food Service Manager at Waupun from January 5, 2020, through August 27, 2022, when he became a Food Service Administrator. Id. at ¶3. He avers that a Food Service Manager serves under the supervision of the Food Service Administrator. Dkt. No. 29 at ¶3. Boushka avers that he was "responsible for a large-scale food production operation and distribution of meals in a highly complex food service program at Waupun." Id. His job duties included preparing meals and specialized diets, assuring proper food preparation, maintaining inventory and various administrative tasks. Id. He also assisted the Food Service Administrator and served as Assistant Food Service Administrator, assuming her overall responsibilities if she was absent from the institution. Id.

Defendant Davis worked at Waupun as Food Service Manager from September 17, 2017 through August 31, 2019; she then served as Food Service

8

Administrator at Columbia Correctional Institution from September 1, 2019 through June 5, 2021, when she became Food Service Administrator at Waupun. Dkt. No. 28 at ¶4. She held that position until April 23, 2022, when she transferred to another institution. Id. She has held several other food service positions at Waupun and other institutions since April 2012. Id. Davis avers that the Food Service Administrator serves under the general supervision of the Correctional Management Services Director. Dkt. No. 31 at ¶3. She is "responsible for the planning, direction, and operation of a complex food service program at the institution." Id. Davis avers that the Institution Food Service Department at Waupun prepares, distributes and serves meals (and medically ordered modified diets) to the approximately 1,250 persons incarcerated at the institution. Id. The Food Service Administrator supervises staff and incarcerated persons, implements the Modified Diet Program, assures that incarcerated persons receive nutritionally sufficient meals and handles various administrative tasks. Id.

b. The Plaintiff's Peanut Allergy

Food Service staff has a list of the plaintiff's multiple food allergies, which include peanuts, fish, grapes and bananas. Dkt. No. 28 at ¶¶9, 11. Boushka and Streekstra, as Food Service Manager and Administrator, were aware of the plaintiff's allergies but they do not recall specifically when they first became aware of his peanut allergy or personal diet plan. Id. at ¶¶10, 12–13. Boushka avers that he and all Food Service staff are informed of potential risks associated with failing to follow an incarcerated person's dietary restrictions,

including "the importance of not giving a peanut item to a person allergic to peanuts." Dkt. No. 29 at ¶8.

### c. Special Diet Snack Bags

Waupun prepares a weekly menu for each diet preference. Dkt. No. 28 at ¶15. Food Service kitchen workers prepare special diet snack bags for religious diets, medical diets and allergy diets. Id. at ¶¶16–17. Both Boushka and Streekstra aver that a Food Service Leader is supposed to be in the diet area to supervise workers preparing diet meals and snack bags. Dkt. No. 29 at ¶20; Dkt. No. 50 at ¶¶11–12. But operations at Waupun have changed many times because of staffing and other issues, so sometimes a Food Service Leader is not present in the diet area. Dkt. No. 29 at ¶20; Dkt. No. 50 at ¶11. Staff place checked and completed bags on a cart to deliver to the incarcerated person's housing unit. Dkt. No. 28 at ¶38.

Boushka avers that during the week, snack bags normally are prepared the same day they are distributed but on the weekends Food Service is not open, so snack bags for Saturday and Sunday are prepared during the week. Dkt. No. 29 at ¶¶16–17. He avers that Food Service staff review all special diet snack bags before they are sent to the recipient. Id. at ¶18. As Food Service Manager, Boushka did not personally prepare diet snack bags and did not prepare the plaintiff's snack bags. Id. at ¶11. He avers that incarcerated workers prepare the diet snack bags, and they are aware of special diets because there are tags on each special diet bag with the incarcerated person's name, unit and allergies. Id. at ¶¶12, 14. Boushka also generally did not

supervise diet meals and did not check diet snack bags before they left the Food Service area, unless a Food Service Leader was unavailable or there was a special issue requiring him to check the bag. Id. at ¶19.

There are cameras in the diet area, but they are used only to monitor movement of the incarcerated persons working in the kitchen. Dkt. No. 28 at ¶29. Food Service leaders can see the diet area but cannot tell which snack bag is being made without seeing the tag with the incarcerated recipient's information. Id. at ¶30. The plaintiff had a tag on his snack bags listing his food allergies and stating that staff must check his snack bag. Id. at ¶32. Boushka avers that he visually checked the plaintiff's diet snack bags at one point, and he found no issue with the snack bags and no peanut butter in the bags. Dkt. No. 29 at ¶21. Boushka marked the tag on the plaintiff's bag to signal that he had checked it and confirmed that it met the plaintiff's dietary needs. Id. Boushka avers that it is not normal protocol for a Food Service Leader, Administrator or Manager to physically mark every diet bag tag for its accuracy. Id. at ¶22. He avers that he checked the bags for "a couple of weeks" and stopped inspecting them only after there consistently were no issues with the snack bags. Id. at ¶21.

Streekstra avers that she has overseen the diet area at times and has checked special diet meals and snack bags. Dkt. No. 50 at ¶¶13–14. She avers that whether she is present or not, a Food Service Leader checks each diet bag before it leaves the Food Service Department. Id. at ¶26. She avers that she has never personally observed peanut butter in the plaintiff's snack bag. Id. at ¶27.

d.    Peanut Butter and SunButter

Both Boushka and Streekstra aver that peanuts are not served at Waupun, though peanut butter is served in individually sealed packets. Dkt. No. 29 at ¶¶24–25; Dkt. No. 50 at ¶19. The defendants provided a picture of the peanut butter packets that Waupun serves incarcerated persons who do not have a peanut allergy. Dkt. No. 29-1. The packets are short tubes with the words "Peanut Butter" in all caps on one side; the other side is transparent, showing the peanut butter inside. Id. Boushka avers that because these packets are individually sealed, the peanut butter does not come into contact with any other food items, and the recipient must open the packet to consume the peanut butter. Dkt. No. 29 at ¶26. He says that peanut butter is not scooped from a container and given in a cup to anyone; only the sealed packets are used. Id. at ¶28.

Because the plaintiff has a peanut allergy, he was given "SunButter," which is made from sunflower seeds. Dkt. No. 28 at ¶¶41, 45. The defendants provided a picture of a SunButter container, which is a small cup labeled with the words "SunButter" and "sunflower butter." Dkt. No. 29-2. The lid of the container states that it is "Free From the Top 8 Allergens." Id. at 1. Boushka avers that SunButter is not scooped out of a container; recipients receive a sealed SunButter cup, which comes with a peel-off lid. Dkt. No. 29 at ¶31. Boushka explains that SunButter "looks very similar to peanut butter but is a little darker." Id. at ¶32. He also explains the difference in taste between the

two products and reiterates that SunButter is made with sunflower seeds but no peanuts. Id. at ¶33.

e.    Plaintiff's Written Complaints

On February 18, 2021, Food Service received an email from Nurse York (not a defendant) stating that the plaintiff had complained to the Health Services Unit about receiving peanut butter in his bag meals on weekends. Dkt. No. 29-3 at 2. Nurse York asked that Food Service adjust the plaintiff's bag meals accordingly. Id.

On March 6, 2021, Boushka received an emailed copy of an institutional complaint that the plaintiff had filed, in which he complained that he received peanut butter packets in his bag meal on February 14, 2021, despite his peanut allergy. Dkt. No. 29 at ¶54; Dkt. No. 29-4. An institution complaint examiner contacted then-Food Service Administrator Wilson (not a defendant), who reported that Food Service had checked the plaintiff's snack bag for accuracy. Dkt. No. 29-4. She told the complaint examiner that "a mistake could have been made but if it was the peanut butter is in a sealed labeled packet." Id. She suggested that the plaintiff notify correctional officers of the mistake so they could obtain a replacement item for him. Id. She said that was exactly what had happened—the plaintiff had "informed the officer and they replaced the peanut butter with some jelly packets." Id. Wilson explained that Food Services was "addressing [the plaintiff's] allergy but sometimes a mistake may be made, it just [sic] human error." Id. She stated that the plaintiff "was not harmed by this as the peanut butter is in a sealed package." Id. The

complaint examiner recommended affirming the complaint, and the reviewing authority accepted that recommendation "simply for the purpose of statistical data." Id.

On May 6, 2021, an institution complaint examiner contacted Boushka about a complaint the plaintiff had filed in which he claimed he was given peanut butter in his snack bag on April 2, 2021. Dkt. No. 28 at ¶55; Dkt. No. 30-1. Boushka told the complaint examiner that Food Service staff check snack bags before they go to the recipient "to make sure all the right items are in the bag." Dkt. No. 30-1. He stated that the plaintiff "may think he is getting peanut butter because he is receiving 'Sun Butter' which is made of sunflowers and not peanuts." Id. He said that the SunButter "looks like peanut butter." Id. Boushka confirmed that SunButter was placed in the plaintiff's bag "and was in the current bag he looked at." Id. The complaint examiner recommended dismissing the complaint because the plaintiff "is not receiving peanut butter he is receiving sun butter." Id.

On May 19, 2021, a complaint examiner contacted Boushka about a complaint the plaintiff had filed in which he claimed he had received a peanut butter bar on his food tray on April 6, 2021. Dkt. No. 28 at ¶56; Dkt. No. 30-2. Boushka reported that the menu for lunch on April 6, 2021 did not have a peanut butter bar for dessert. Dkt. No. 30-2. Boushka said that if any sort of peanut butter bar were being added to the menu, he would have contacted Food Service staff about it; but he found no such email. Id. Boushka stated that the plaintiff's food tray was prepared in the diet area, "and if there is any

type of peanut butter dessert for a meal it is substituted for another dessert." Id. He also stated that staff verify what is placed on the plaintiff's meal tray, and the officer working the plaintiff's housing unit did not remember the plaintiff talking to him about a peanut-containing item on his tray. Id. The complaint examiner recommended rejecting the complaint because there was "no way to verify if there was actually any peanut butter bar on his tray." Id.

On June 7, 2021, a complaint examiner contacted Boushka about a complaint the plaintiff had filed in which he claimed he had received peanut butter on his food tray on April 19, 2021. Dkt. No. 28 at ¶57; Dkt. No. 30-3. Boushka reported that Food Service reviews all food trays before they are sent out, and the plaintiff was receiving SunButter. Dkt. No. 30-3. He explained that if the plaintiff had received peanut butter, "it could be that inmate workers in RHU [Restricted Housing Unit] are removing the Sunbutter from the trays and replacing it with peanut butter." Id. The complaint examiner reported that although there was "no way to verify how regular peanut butter got on [the plaintiff's] tray," RHU staff "did replace it for him." Id. The complaint examiner also stated that the plaintiff was not harmed by receiving an incorrect item, if he did indeed receive it. Id. She recommended affirming the complaint "for statistical purposes" and suggested that the captain look into the issue. Id.

The next day, June 8, 2021, a complaint examiner again contacted Boushka about a complaint the plaintiff had filed in which he claimed he had received peanut butter in his breakfast bag on April 25, 2021. Dkt. No. 28 at ¶58; Dkt. No. 30-4. Boushka again confirmed that Food Service staff reviewed

the plaintiff's breakfast bags before they were sent out, and the plaintiff was receiving SunButter. Dkt. No. 30-4. He again suggested that "inmate workers in RHU" could be removing the SunButter and replacing it with peanut butter. Id. The complaint examiner found that, as with the previous complaint, RHU staff had replaced the plaintiff's food item, he was not harmed by receiving the peanut butter and the captain would be contacted to look into the issue. Id.

Boushka avers that he does not recall receiving any Information Requests or other communication from the plaintiff. Dkt. No. 29 at ¶43. He says Food Service does not track all written correspondence from incarcerated persons; staff reviews Information Requests and responds to the requests, but Food Service does not maintain a copy of the response. Id. Boushka was able to find one Information Request from the plaintiff dated June 15, 2021, in which the plaintiff reported that he had an allergic reaction the previous day after he received a peanut butter bar. Id. at ¶44; Dkt. No. 29-5. The plaintiff asked, "whats up with that" and stated that he "will B [sic] filing a lawsuite [sic] against yaw [sic] PB, Bar was in snack bag." Dkt. No. 29-5. There is no response included. Id.

f.     June 14, 2021

On June 14, 2021, Boushka worked in the Food Service Department at Waupun from 6:00 a.m. until 2:30 p.m. Dkt. No. 29 at ¶35. He avers that the plaintiff was on a high protein/high calorie diet, so he received a cookie in his snack bag that day. Id. at ¶36. But he says that Waupun orders prepackaged

16

cookies for use in its snack bags, and the cookies do not contain peanuts or peanut byproducts for cost and food-allergy reasons. Id.

On June 16, 2021, Food Service received an email from Nurse York stating that the plaintiff had had an allergic reaction on June 15, 2021, after eating "a bar . . . that was in his snack bag. Said treat may or may not have had Peanuts or peanut butter in it." Dkt. No. 28 at ¶62; Dkt. No. 29-6 at 2. York wrote that the plaintiff complained that he was allergic to peanuts but "still gets peanut butter in his snack bags." Dkt. No. 29-6 at 2. Boushka responded to York's email the next day, explaining that "the so called peanut butter packets in [the plaintiff's] snack bag [were] sun butter which is made of sunflower seeds instead of peanuts." Id. He explained that the plaintiff had complained about the issue before, and that Boushka had checked the plaintiff's snack bag to confirm the item was correct and was not peanut butter. Id. Bouschka said that he explained this to the complaint examiner and "gave her a sample cup of it. Once that was explained to [plaintiff] he went silent." Id. Boushka opined that an institutional worker had incorrectly given "by accident a peanut butter dessert at one meal for everyone when they know that they can[']t do that for everyone." Id. Boushka explained that he would "again be making random checks on [the plaintiff's] meal as [he] know[s] the importance of not giving a peanut item to a[n] allergy [sic] person." Id. Boushka clarified, "This by no means is an excuse on what took place however [Food Service is] down 50 percent of a normal staff" in the kitchen, and "inmates in diet seem to leave quicker than they show up." Id. He reiterated that he would

make random checks on the plaintiff's meals to confirm his food items were correct.[1] Id.

Medical staff saw the plaintiff in the Health Services Unit on June 14, 2021 for his complaints of an allergic reaction after having eaten a cookie that likely contained peanuts. Dkt. No. 28 at ¶80; Dkt. No. 32-1 at 3. A nurse (not a defendant) examined the plaintiff and reported that his lungs were clear, but that his tongue was "moderately swollen," and the plaintiff reported "that his throat felt tight." Dkt. No. 32-1 at 3. The nurse administered an albuterol nebulizer, provided the plaintiff an antihistamine (diphenhydramine) and monitored him in the exam room for a half-hour to an hour. Id. The nurse reported that the plaintiff's lungs remained clear, and his tongue swelling had decreased. Id. at 5. The plaintiff also reported subjective improvement. Id.

### g.    Defendant Davis's Involvement

Davis avers that she does not recall the plaintiff writing to her or the Food Service Department before June 14, 2021 about receiving peanut butter or having an allergic reaction to a peanut-containing item. Dkt. No. 31 at ¶6. She reports that her first day as Food Service Administrator at Waupun was June 7, 2021, only one week before the plaintiff's documented allergic reaction. Id. When she assumed that role, Davis learned about the plaintiff's multi-allergy diet; that is, a diet that has more than one allergy limitation. Id. at ¶7.

---

[1] The plaintiff asserts that Nurse York wrote the incorrect date for his allergic reaction. Dt. No. 68 at ¶62. He says he suffered the allergic reaction on June 14, 2021, which was a Monday. Id.

Davis states that Waupun provided the plaintiff SunButter to accommodate his peanut allergy. Id. at ¶8.

Davis avers that as Food Service Administrator, she did not regularly prepare or check special diet snack bags or meals before they left Food Service. Id. at ¶9. She performed these duties only if there was no Food Service Leader or Manager available because those persons handled that responsibility. Id. at ¶10. Davis avers that in those instances, she would have an incarcerated person working in the Food Service Department correct any snack bag with an improper item; she then would sign off on the bag and place the bag for delivery to the housing unit. Id. at ¶11. She says that when she checked the plaintiff's snack bag, she "would pour the contents out onto the container and place every item back into his bag." Id. at ¶12. She did this to ensure "that no peanut butter packets went into this snack bag." Id.

Davis recalls the plaintiff writing to her or to Food Service about peanut butter being in his snack bag. Id. at ¶13. She specifically recalls him asking RHU staff to call Food Service to tell them that he had received peanut butter in his bag. Id. at ¶14. In those instances, Davis would send SunButter to the RHU for the plaintiff. Id. Davis says that after several complaints from the plaintiff, she went to the RHU to "look into [the plaintiff's] claim." Id. at ¶15. She says that unit staff told her that the plaintiff "would manipulate new staff or the 'infusion' staff to give him packets of peanut butter" by telling them "that he was on a hunger strike during the day and that now he was hungry." Id. Once those staff members completed their shift, the plaintiff would complain to

the next shift staff that Food Service had given him peanut butter. Id. Davis opines that RHU staff were not aware of the plaintiff's peanut allergy, often because staff either were new or "infused," which means they were temporarily working at Waupun from other institutions because of "critical vacancies." Id.

Davis says she was not able to verify the RHU staff's comments, so she implemented measures to avoid similar issues in the future. Id. at ¶16. She asked for the plaintiff's door to be labeled "peanut allergy" to alert staff not to give him peanut-containing items. Id. She also used a clear plastic bag instead of a paper bag so all staff could see the contents of the plaintiff's snack bag before it was delivered to him. Id. at ¶17. Davis asked that staff place the container of SunButter "very obviously up against the side of the clear plastic bag so that it could be seen." Id. at ¶18. She avers that the plaintiff "was not happy when Food Service made the change to clear bags." Id. at ¶19. She says he repeatedly had RHU staff call Food Service to request that his food items be placed in a brown paper bag instead, claiming that incarcerated persons housed in the RHU could not have plastic bags. Id.

Davis cannot recall the specific date of the change to plastic bags but surmises it may have been on or around February 8, 2022, because she found an email from that date about the procedure change. Id. at ¶20; Dkt. No. 31-1. Davis sent that email to remind Food Service to have staff check "certain diets," "especially [the plaintiff's] snack bag due to his peanut allergy." Dkt. No. 31 at ¶21; Dkt. No. 31-1 at 1. The email also includes an attachment showing the plaintiff as one of the "problematic diets" necessitating the changes. Dkt. No.

31-1 at 2. Davis attached another email she sent on April 4, 2022, reminding Food Service staff "that RHU does NOT get plastic bags. EXCEPT FOR [THE PLAINTIFF]. All others are in paper bags." Dkt. No. 31-2 (all caps in original).

### 3. *The Plaintiff's Materials*

#### a. The Plaintiff's Exhibits

Before the court received any of the plaintiff's papers in response to the defendants' motion, it received the 311-page packet of exhibits from the plaintiff. Dkt. No. 45. These exhibits are not in any discernible order, and they are not consistently labeled. Some exhibits are labeled with numbers, others are labeled with letters. Other exhibits are not labeled at all, and their relevance is not readily apparent. The court will review only the exhibits that the plaintiff cites in his response materials. See Fed. R. Civ. P. 56(c)(3).

#### b. The Plaintiff's Declaration

The plaintiff separates his declaration into subsections covering a range of topics. Dkt. No. 69. The court summarizes his declaration based on these subsections.

##### i. The Defendants' Perjury

The plaintiff begins his declaration by averring that the defendants "lied under perjury." Id. at 2. He cites as an example Boushka's statement that he does "not independently recall receiving anything from Plaintiff" in writing before June 14, 2021. Id. at ¶4. The plaintiff cites "the defendents [*sic*] exhibit" that he says is "a copy of [him] writing to food service." Id. at ¶5 (citing "ex 1000 at 001-002). Exhibit 1000 is the photo of the peanut butter packet, and it

has only one page. Dkt. No. 29-1. The plaintiff may have meant to cite to his own Exhibit 1000, but the court could not locate that document in his 311-page packet. The plaintiff may have meant to refer to the information request he sent Food Service on June 15, 2021, which the defendants marked as Exhibit 1008. Dkt. No. 29-5. The court infers that the plaintiff believes this exhibit shows that Boushka lied about not recalling whether he received correspondence from the plaintiff on or before June 14, 2021—even though the information request is dated June 15, 2021. Id.

The plaintiff avers that he wrote to the former Food Service Administrator (Wilson) on April 12, 2021, asking why he was receiving peanut butter bars on his food trays. Dkt. No. 69 at ¶8 (citing Dkt. No. 45-1 at 9). He says that Boushka responded to his request, informing him, "your bag will be checked daily for P.B. [peanut butter] all 'FS' staff has been informed of this. This should resolve any issues." Id. The court infers that the plaintiff believes that this also shows that Boushka corresponded with the plaintiff before June 14, 2021.

The plaintiff asserts that Streekstra said in response to an interrogatory that she did "not recall when [she] was made aware of Plaintiff's personal diet plan." Id. at ¶9 (citing Dkt. No. 45 at 40). He says that in her response to the plaintiff's request for admissions, Streekstra denied that in 2021 she told him she would "be 'real strick' [sic] with [his] allergy meals." Id. at ¶10 (citing Dkt. No. 45 at 15). He cites Streekstra's response to his April 18, 2021 information request asking about receiving peanut butter in his night snack bag; Streekstra

wrote that she had "started to be more strict with [his] bag to keep an eye on what [he was] getting." (citing Dkt. No. 45-1 at 1). Id. at ¶11. He avers that Streekstra also replied to two information requests he sent on April 4, 2021 about getting peanut butter in his snack bag. Id. at ¶¶12–13 (citing Dkt. No. 45-1 at 3, 5). The court infers that the plaintiff believes this evidence shows that Streekstra lied when she said she did not recall when she was made aware of the plaintiff's diet plan.

The plaintiff says that in response to his requests for admissions, Davis denied having "sufficient knowledge or information" to admit or deny his requests about responding to the plaintiff's 2021 information requests about his snack bags. Id. at ¶15 (citing Dkt. No. 45 at 22). He says Davis then admitted generally that the plaintiff wrote to her about peanut butter in his snack bags. Id. at ¶16 (citing Dkt. No. 45 at 24). But when the plaintiff asked Davis in an interrogatory if he had written to her before June 14, 2021, she stated, "Not that I am aware" and said that her "first day at Waupun Correctional Institution as a Food Service Administrator was June 7, 2021." Id. at ¶17 (citing Dkt. No. 45 at 48). He points out that Davis later said she had worked at Waupun in different roles in 2017 through 2019. Id. at ¶18 (citing Dkt. No. 45 at 44). The court infers that the plaintiff believes that this evidence shows that Davis lied about not having sufficient knowledge or information to respond to his discovery requests regarding her responses to the plaintiff's 2021 information requests about his snack bags.

ii.     Streekstra's Declaration

The plaintiff asserts that the court should not consider Streekstra's declaration because the defendants did not include it with their initial summary judgment materials. Id. at ¶¶26–28. As the court has explained, it already has resolved this issue; the court granted the defendants' motion for leave to file Streekstra's declaration and said that it would consider her declaration when deciding the motion for summary judgment. Dkt. No. 58.

iii.     The Defendants' "inconstant [*sic*] stories"

The plaintiff avers that Boushka and Davis claimed that Food Service is closed on the weekends but that Streekstra averred that Food Service is open on the weekend. Dkt. No. 69 at ¶¶29–30 (citing Dkt. No. 45 at 10, 16–17, 23–24). The cited responses to the plaintiff's requests for admissions show that Boushka did respond that the "Food Service Department is not open on the weekends." Dkt. No. 45 at 10. Davis similarly denied working Saturdays or Sundays in the Food Service Unit in 2021. Id. at 23–24. But the plaintiff did not ask Streekstra to admit that she worked in the Food Service unit on those days, and she did not say that she did; Streekstra admitted only that she worked Saturdays and/or Sundays in 2021. Id. at 16–17.

iv.     Statements from the plaintiff and other
         incarcerated persons about food service

The plaintiff avers that he worked in the Food Service Department at Green Bay Correctional Institution from July to September 2018. Dkt. No. 69 at ¶¶31–33. He says that during part of this time, he prepared diet trays, including "placing tag's on tray's, bags for special diets," and that at another

24

time he worked "in the line where inmate fixed tray's and serve them to staff and inmates throughout the institution." Id. at ¶¶34–35. He says that on some occasions, kitchen staff would "sco[op] the peanut butter from a white tub into a small cup to serve to inmates and staff." Id. at ¶37. The plaintiff says that Green Bay served peanut desserts, including "cake with peanut butter frosting, peanut butter cookies, peanut butter bars and so forth." Id. at ¶38. The plaintiff says he also worked in the Food Service Department at Columbia Correctional Institution from June to August 2019. Id. at ¶41. He says he again worked in the diet area "fixing and prep[p]ing diet meals, placing tags on tray's" for persons with special diets. Id. at ¶45. He says that Columbia similarly served scoops of peanut butter "in a small white cup" taken from "a white tub" and served similar peanut butter desserts. Id. at ¶¶48–49.

The plaintiff avers that the Food Service Department at Waupun operates the same as those at Green Bay and Columbia, where he previously was incarcerated and worked in the Food Service Department. Id. at ¶¶51–53. He says the defendants lied and stated that Waupun does not serve peanut butter in a cup and does not serve the same peanut butter desserts as the other institutions. Id. at ¶54. In support of these statements, the plaintiff cites declarations from four other incarcerated persons. Id. at ¶¶51–52 (citing Dkt. No. 45 at 51–60). The plaintiff attached two declarations from Dexter Ewing. Dkt. No. 45 at 51–53. Ewing's first declaration avers that the plaintiff suffered an allergic reaction to peanuts on June 14, 2021 and that the plaintiff notified staff about receiving peanuts several times before then. Id. at 51–52. Ewing's

second declaration avers that he worked in the kitchen at Waupun preparing fruits and vegetables. Id. at 53. He avers that he "observe[d] the diet area trays being fixed by inmates" and that "staff never checked them nor inspect them before being sent out." Id. He says "that's why it be so much [*sic*] extra food and a mix up with the food all the time." Id. Ewing says nothing about peanuts, peanut butter or peanut butter desserts served at Waupun or other institutions.

The plaintiff submitted three declarations from Kurtis D. Jones. Id. at 54–56. Jones avers that he worked at the kitchen in Waupun in 2020 and "witnessed staff control[l]ing the portions of inmates meals and even prepare the meals and diet trays themselves." Id. at 54. He says the "daily calorie needs" of persons incarcerated at Waupun "are not being met." Id. Jones's second declaration avers that the "[m]ajority of [the] desserts in [Waupun] have peanut butter in it; i.e. cookies, cakes, etc." Id. at 55. He says the bag meals served since November 2022 are often peanut butter sandwiches or peanut butter in a "little white cup," which "got on every other content in the bag." Id. Incarcerated person Adam Ozuna similarly avers that Waupun serves peanut butter desserts, peanut butter cookies and peanut butter in "little white cups." Id. at 57. He also says that Waupun once, "about 3 years ago," served peanut butter cheesecake as a dessert on Thanksgiving. Id. Incarcerated person Anthony Keepers submitted a declaration about the plaintiff receiving a fish patty on his tray on April 1, 2022. Id. at 58-59. He submitted a second declaration that is difficult to read. Id. at 60. But it appears that he avers that

while working in the kitchen at Waupun, he "routinely witnessed the diet chef/supervisor [illegible] making trays and checking religious/allergy trays before they went out." Id. Keepers does not say when this occurred, and to the extent that the court can read it, the declaration says nothing about peanuts, peanut butter or peanut-containing items. Id.

> v.     Plastic Bags in the RHU

The plaintiff avers that incarcerated persons in the RHU receive limited items, and he says plastic bags are not allowed. Dkt. No. 69 at ¶¶56, 69[2]. He says that RHU sergeants "even called food service to warn them to not to [*sic*] send [his] food in clear plastic bags because its not allowed." Id. at ¶70. The plaintiff avers that on August 15, 2023, he asked an RHU captain not to allow Food Service to send his food in clear plastic bags. Id. at ¶71. He says the captain responded, "if it comes in a 'plastic bag it should be removed.'" Id. (citing Dkt. No. 45-1 at 34–35). The plaintiff cites a portion of a Division of Adult Institutions policy, which (according to the plaintiff) says "[p]lastic bag containing food items are not allowed in RHU. The food will be taken out of the clear plastic bag by staff." Id. at ¶96 (citing Dkt. No. 45 at 61–86). The court could not find this specific language in the cited policy.

> vi.     RHU Incarcerated Workers

The plaintiff avers that incarcerated persons who work in the RHU "are not allowed to pass–trade–exchange anything." Id. at ¶72. He says there are

---

[2] The declaration jumps from paragraph 56 to 67, and pages 16 and 17 are out of order.

cameras in the RHU that monitor incarcerated persons and staff. Id. at ¶73. He avers that incarcerated RHU workers "are only allowed to bring in meals on cart's and to sep[a]rate diet trays–bag's to the range that the inmate who is receiving diet trays–bags[] and to set food tray's–bags upon the range's the food is going to so staff can pass out tray's." Id. at ¶75. He says that on August 9, 2023, he sent an information request asking if incarcerated workers were allowed to take or exchange items from other incarcerated persons' meal bags. Id. at ¶76. The captain responded, "No they are not." Id. (citing Dkt. No. 45-1 at 32).

### vii.     The Plaintiff's "initial rast[3] test"

The plaintiff avers that when incarcerated persons enter a Department of Corrections institution, medical staff screen them for medical issues. Id. at ¶77. He says that during his health intake at Waupun on November 8, 2019, he told medical staff that he is allergic to peanuts, fish and other items. Id. at ¶79. Medical staff already knew the plaintiff's food allergies because he previously was incarcerated in other DOC institutions. Id. (citing Dkt. No. 45 at 169). He says he has taken three "rast test to determined [*sic*] [his] food allergies," which showed he is allergic to peanuts, codfish and other items. Id. at ¶80. He says that if he consumes these foods, he "brake [*sic*] out in hives,

---

[3] A RAST is a radioallergosorbent test that looks for the amount of antibodies present in blood when there has been an allergic reaction. https://www.mountsinai.org/health-library/tests/allergy-testing-skin#:~:text=The%20RAST%20(Radioallergosorbent%20test)%20is,test%20or%20skin%20prick%20test.

have trouble breathing, throat close's up and feel tight, [his] eyes get red, [he] throw[s] up and so forth." Id. at ¶81.

<blockquote>viii.    The Plaintiff's Raisin Allergy</blockquote>

The plaintiff avers that although the defendants "all acknowledge [his] food allergies of [his] multi allergy diet," none of them include his allergy to raisins in their list of his food allergies. Id. at ¶¶82–83. He says Food Service did not update his food allergy list until recently, in 2023. Id. at ¶83. He cites "ex G-3 as multiallergy," id., but the court could not find this document in his packet of exhibits.

<blockquote>ix.    "[C]onflicts between staff in RHU and food service unit"</blockquote>

The plaintiff avers that staff in the RHU have accused Food Service staff of being "incapable of doing their job by sending diet tray's with regular tray's, and delaying an hour from sending diet tray's, plus sending inmates including [him] food, [that he is] allergic to." Id. at ¶84. He says this has created "a hostile climate in seg[regation] due to their inadequate work performance." Id. In support of these statements, the plaintiff cites incident reports from January and April 2022. Id. (citing Dkt. No. 45 at 183–192). The plaintiff does not explain whether or how these incidents relate to him receiving improper items in his snack bags on and before June 14, 2021.

<blockquote>x.    Staff Checking the Plaintiff's Food Trays</blockquote>

The plaintiff avers that the "process of [him] getting [his] meals is a process." Id. at ¶85. He says that Food Service checks his meal bags before they leave that unit, staff again checks his trays when they arrive in the RHU

and sometimes staff again checks his trays in front of his cell. Id. at ¶¶86–87.

He says these checks occur because he has received not only peanuts but also

fish and raisins, to which he is allergic. Id. at ¶88. The plaintiff avers that he

"cannot bribe staff to give [him] food items [he is] allergic to, due to [his] meals

are checked in 'RHU' before its giving [*sic*] to [him], plus a tag comes along with

[his] allergies," which he has received since 2020. Id. at ¶93. The plaintiff

disputes Davis's statement that she requested the plaintiff's door be labeled

"peanuts allergy." Id. at ¶94. He says an Officer Stoffol (not a defendant) is the

person who put this tag on his door because she noticed how often the plaintiff

received foods that he is allergic to. Id. at ¶¶96–97.

xi.     The Plaintiff's Allergic Reactions Before and on
June 14, 2021

The plaintiff avers that he first suffered an allergic reaction to peanut

butter on November 8, 2019, when he was served peanut butter "that was

sco[o]ped in a white cup." Id. at ¶97. He says he again was seen for his peanut

allergy on December 29, 2019, and nurses gave him Benadryl for swelling in

his tongue. Id. at ¶99. He says he has suffered four to five allergic reactions to

peanuts or peanut butter while at Waupun, and he claims it is "due to food

service inadequate work performance." Id. at ¶100. He says he continued to

receive foods on his food allergy list even after Officer Stoffol listed his full

allergy list on a note posted to his cell door. Id. (citing Dkt. No. 45 at 187–191

(2022 Incident Reports)). The plaintiff avers that the June 14, 2021 incident

was his second allergic reaction to peanuts. Id. at ¶101. He claims his reaction

"were [*sic*] so severe [he] was seen by three different nurses." Id. at ¶102. He

30

says he was given Benadryl four times for his reaction on June 14 and 15, 2021. <u>Id.</u> at ¶106 (citing Dkt. No. 45 at 161–163, 165, 171).

xii.     The Defendants' "Semantics"

The plaintiff avers that the defendants "try and use semantics by stating Waupun don[']t served [*sic*] 'peanuts' but 'peanut butter.'" <u>Id.</u> at ¶109. He argues that "it is utterly foolish to say such things." <u>Id.</u> at ¶111. He asserts that because Waupun serves peanut butter packets, it technically serves peanuts. <u>Id.</u> at ¶110. The plaintiff details his education history, which he says shows that he can "most surely tell the difference between food items, peanut, peanut butter versus sun butter." <u>Id.</u> at ¶125. He says he knows when he "receive[s] peanut's, or and peanut butter which is the same ingredient verse sunbutter." <u>Id.</u>

Finally, the plaintiff alleges that he still is receiving peanuts and peanut butter food items from Food Service. <u>Id.</u> at ¶129. He says he wrote to Boushka in March and May 2023 about missing food items and about receiving peanut butter in his bag meals. <u>Id.</u> at ¶¶129–130 (citing Dkt. No. 45-1 at 21–26).

## II.  Discussion

### A.  <u>Summary Judgment Standard</u>

A party is entitled to summary judgment if he shows that there is no genuine dispute as to any material fact and he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); <u>see also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). "Material facts" are those that "might affect the outcome of the suit." <u>See</u> <u>Anderson</u>, 477 U.S. at 248. A dispute over a "material

31

fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id.

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Neither argument nor speculation is enough to avoid summary judgment. See Ammerman v. Singleton, 817 F. App'x 265, 268 (7th Cir. 2020) (citing Herzog v. Graphic Packaging Int'l, Inc., 742 F.3d 802, 806 (7th Cir. 2014)). Instead, the plaintiff, as the non-moving party, "needs to come forward with *evidence*" that would allow a jury to return a verdict in his favor if the case proceeded to trial. See Beatty v. Olin Corp., 693 F.3d 750, 754 (7th Cir. 2012) (emphasis in original).

B.    Eighth Amendment

The court analyzes the plaintiff's claim that prison staff were deliberately indifferent to his serious medical need under the Eighth Amendment's cruel and unusual punishments clause. Estelle v. Gamble, 429 U.S. 97, 104 (1976). An Eighth Amendment claim consists of both objective and subjective components. Farmer v. Brennan, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must show that he "is incarcerated under conditions posing a substantial risk of serious harm." Id.

In the context of a claim that prison staff were deliberately indifferent to a plaintiff's serious medical need, the objective component requires the plaintiff

to show that his medical need constituted a risk of an objectively serious harm. Stewart v. Wexford Health Sources, Inc., 14 F.4th 757, 763 (7th Cir. 2021) (citing Balsewicz v. Pawlyk, 963 F.3d 650, 654 (7th Cir. 2020)). "A medical condition is deemed to be serious if it may be 'life threatening or pose[s] a risk of needless pain or lingering disability if not treated at once.'" Karraker v. Peters, 65 F.3d 170 at *3 (7th Cir. 1995) (citing Davis v. Jones, 936 F.2d 971, 972 (7th Cir. 1991)). But the Supreme Court also has held "that medical conditions far less critical than 'life-threatening' would be encompassed" by the term "serious medical need." Gutierrez v. Peters, 111 F.3d 1364, 1370 (7th Cir. 1997). Factors the court must consider in determining whether a plaintiff's medical need is sufficiently serious is whether his condition has been diagnosed by a physician as needing treatment, id. at 1373 (citing Laaman v. Helgemoe, 437 F. Supp. 269, 311 (D.N.H. 1977)); whether failure to treat the condition could result in further serious injury or unnecessary and wanton infliction of pain, id. (quoting McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir. 1992)); and whether the condition significantly affects the plaintiff's daily activities, id. (quoting McGuckin, 974 F.2d at 1059-60).

To satisfy the subjective component, the plaintiff must demonstrate that the defendants had a "sufficiently culpable state of mind." Farmer, 511 U.S. at 834. A prison official shows deliberate indifference when she "realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk." Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015) (citing Farmer, 511 U.S. at 837). "The standard of deliberate indifference 'requires more than

negligence or even gross negligence; a plaintiff must show that the defendant was essentially criminally reckless, that is, ignored a known risk.'" <u>Stewart</u>, 14 F.4th at 763 (quoting <u>Huber v. Anderson</u>, 909 F.3d 201, 208 (7th Cir. 2018)). The evidence must show the defendant's "actual, personal knowledge of a serious risk, coupled with the lack of any reasonable response to it." <u>Ayoubi v. Dart</u>, 724 F. App'x 470, 474 (7th Cir. 2018) (citing <u>Farmer</u>, 511 U.S. at 837, 844–45).

C.    <u>Analysis</u>

The parties do not dispute that the plaintiff has a peanut allergy that could constitute an objectively serious medical need. Dkt. No. 27 at 19. The court explained in the screening order "that the plaintiff's allegations about his severe peanut allergy, and the medical treatment he required to treat an allergic reaction to peanuts, satisfy the objective component of an Eighth Amendment claim." Dkt. No. 11 at 5 (citing Dkt. No. 7 at 5; <u>Gambrell v. Weichart</u>, Case No. 15-CV1146, 2017 WL 1194011, at *3 (E.D. Wis. Mar. 30, 2017)). The court assumes for purposes of this decision that the plaintiff's peanut allergy constitutes an objectively serious medical need. The question is whether the defendants were aware of but deliberately indifferent to the plaintiff's peanut allergy.

1.    *Deliberate Indifference*

As the court explained in the order screening the amended complaint,

Deliberate indifference "poses a 'high hurdle and an exacting standard' requiring 'something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" <u>Stockton v. Milwaukee County</u>, 44 F.4th 605, 615 (7th Cir. 2022) (quoting

Donald v. Wexford Health Sources, Inc., 982 F.3d 451, 458 (7th Cir. 2020)). While "[n]egligence, or even objective recklessness, is insufficient to satisfy deliberate indifference," id. (citing Petties v. Carter, 836 F.3d 722, 728 (7th Cir. 2016)), if a defendant knows of a plaintiff's severe peanut allergy but "blows off" his concerns and makes his snack bag the same way he or she makes any other incarcerated person's snack bag, a jury could conclude that that person was deliberately indifferent to a severe risk to the plaintiff.

Dkt. No. 11 at 7.

The undisputed evidence shows that incarcerated workers prepare most meal trays and snack bags at Waupun. There is a "special diet" area where Food Service workers prepare trays and bags for incarcerated persons with food allergies and special diets. These incarcerated persons' foods are not prepared in the same area or in the same way as those persons without food allergies or special diets. Special diet bags are tagged with the incarcerated person's name, unit and food allergies or special diet. Incarcerated workers are aware of the special diets and the tags documenting each person's food allergies, and they are trained how to prepare snack bags and meals in accordance with those allergies and special diets. There usually is a chef or supervisor in the diet area to ensure diet trays and snack bags are properly prepared. But there have been times when a supervisor has not been available because of low staffing at Waupun. The plaintiff's snack bags were prepared in the special diet area because of his documented food allergies, including his allergy to peanuts. There is a tag on the plaintiff's snack bag listing his food allergies and requiring staff to check his bag before he receives it.

The undisputed evidence shows that Waupun serves peanut butter to incarcerated persons who do not have a peanut allergy. Peanut butter is served

in individually sealed packets with the words "Peanut Butter" printed repeatedly on one side. Dkt. No. 29-1. The other side is transparent, which makes it easy to see the peanut butter inside the packet. Waupun serves "SunButter" cups to incarcerated persons with peanut allergies. These cups are individually sealed, and the label says "SunButter" and states that the product is "Free From the Top 8 Allergens." Dkt. No. 29-2.

The plaintiff avers that the defendants "knew the risk" of preparing his diet trays or meal bags around other diet trays and disregarded that risk. Dkt. No. 69 at ¶107. But there is no evidence supporting that assertion or suggesting that the defendants "blew off" the plaintiff's concerns about his snack bags and prepared his foods around those of incarcerated persons who do not have a peanut allergy. The plaintiff has presented no evidence showing that any of the defendants personally and regularly prepared or checked his snack bags or meal trays; he has presented no evidence that they did so in a way that created a risk that he would be exposed to peanuts or a peanut-containing item. Boushka and Davis aver that in their positions as Food Service Manager and Administrator, they usually did not prepare or check snack bags or meals before the bags went to the incarcerated person. They explain that a Food Service Leader performs those duties. Streekstra, as a Food Service Leader, sometimes did check diet trays or bags as part of her job duties, but she did not prepare the bags and meal trays. She says that incarcerated workers prepared the bags and trays. Streekstra avers that on the

occasions when she checked the plaintiff's snack bag, she never saw peanut butter or a peanut-containing item in the bag.

The plaintiff speculates based on his experience working in other institutional kitchens that the defendants prepared his snack bags or meal trays. He submitted affidavits from other incarcerated persons who did work in the kitchen at Waupun and either did or did not see unspecified supervisors and staff checking trays and snack bags before they went out. The plaintiff insists that Davis and Boushka did prepare his snack bags, and he asserts that Streekstra prepared his snack bag on June 14, 2021. But he has presented no evidence showing that he has personal knowledge of who prepared his snack bag on any given day, and he presented no evidence that Boushka, Streekstra or Davis personally prepared or checked his snack bags or meal trays and did so recklessly or in disregard to his peanut allergy. His speculation and insistence that one or all three defendants prepared and/or checked his snack bags is not evidence and does not create a genuine dispute of fact. See Cambronero v. Meli, Case No. 22-2103, 2023 WL 4946724, at *2 (7th Cir. Aug. 3, 2023) (citing Pulera v. Sarzant, 966 F.3d 540, 550–51 (7th Cir. 2020)).

Davis and Boushka aver that although they did not check snack bags as part of their regular job duties, there was a time when they checked the plaintiff's snack bags because of his frequent complaints. The undisputed evidence shows that when Davis personally checked the plaintiff's snack bags or meal trays before Food Service sent them to the plaintiff, she dumped out

the entire contents of the bag and then confirmed that there were no foods to which the plaintiff was allergic before putting the items back in the bag and placing the bag with the others to be delivered. Dkt. No. 31 at ¶12. Boushka similarly avers that he randomly checked the plaintiff's snack bags for a few weeks in April through June 2021. He says that he never found a peanut-containing item in the plaintiff's snack bag. He says that after he confirmed that the bag did not contain an improper item, he would check off the tag on the plaintiff's bag, even though it is not normal protocol for the Food Service Manager to do so on any snack bag. Dkt. No. 29 at ¶¶21–22.

This evidence shows that, rather than disregarding the plaintiff's peanut allergy, the defendants took extra steps to accommodate his allergy. Davis and Boushka, in their roles as Food Service Administrator and Manager, do not regularly check an incarcerated person's meal bag or tray before it is delivered. Yet they checked the plaintiff's bags or trays at various times because of his complaints. Neither defendant noticed an improper item on the plaintiff's tray or in his bag. These reasonable, extra efforts to avoid the plaintiff receiving a peanut-containing item show that the defendants were not deliberately indifferent to his food allergy, even though he still occasionally may have received an improper item. See Rasho v. Jeffreys, 22 F.4th 703, 710 (7th Cir. 2022) (citing Farmer, 511 U.S. at 844) ("Evidence that the defendant responded reasonably to the risk, even if he was ultimately unsuccessful in preventing the harm, negates an assertion of deliberate indifference."); Peate v. McCann, 294 F.3d 879, 882 (7th Cir. 2002) ("Indeed, prison officials who actually knew of a

substantial risk to prisoner health or safety are free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted, because in that case it cannot be said that they were deliberately indifferent.").

The plaintiff filed several institutional complaints about receiving a peanut butter packet or peanut butter bar in the first half of 2021. Either Boushka or former Food Service Administrator Wilson responded to these complaints. (Davis was not the Food Service Administrator at Waupun until June 6, 2021, so she was not responsible for responding to the plaintiff's complaints before then.) Boushka stated in response to some of these complaints that he personally checked the plaintiff's snack bag, and the plaintiff was given SunButter and not peanut butter. He suggested that a Food Service worker or another incarcerated person may have swapped out the plaintiff's SunButter for peanut butter or that the plaintiff *had* received SunButter but mistakenly believed it was peanut butter. On one occasion Wilson explained that if the plaintiff had received a peanut butter packet, it would be sealed; no peanut butter would have been in contact with other food items, and the plaintiff would not have been harmed. Wilson explained that sometimes a mistake may be made because of "human error." Dkt. No. 29-4. There is no evidence that the plaintiff suffered an allergic reaction or was harmed by receiving a peanut butter packet or item in his snack bag on any of these occasions. The undisputed evidence shows that when the plaintiff received a peanut butter packet or food item, Waupun staff took it from him and exchanged it for a food item that did not contain peanuts or peanut butter.

The plaintiff suffered an allergic reaction on June 14, 2021, after consuming a cookie that was in his snack bag. A nurse reported that the cookie "may or may not have had Peanuts or peanut butter in it." Dkt. No. 29-6 at 2. There is no evidence that this *was* a peanut butter cookie or that it contained peanuts or peanut butter, and Boushka avers that Waupun does not purchase peanut-butter flavored cookies or cookies with peanut butter or peanuts in them because of cost and allergy issues. The plaintiff has presented no evidence that he had personal knowledge of what kinds of cookies the institution does or does not purchase, but he insists without evidence that the institution serves peanut butter cookies and that he consumed a peanut butter cookie on June 14, 2021. As the court stated above, the plaintiff's speculation that this was a peanut butter cookie, without any evidence supporting that speculation, cannot defeat the defendants' summary judgment motion. See Cambronero, 2023 WL 4946724, at *2; Pulera, 966 F.3d at 550–51.

The amended complaint alleges that Streekstra "fixed" the plaintiff's snack bag on June 14, 2021, which contained the problematic cookie. Streekstra admitted that she worked in the kitchen that day. But there is no evidence that she personally prepared the plaintiff's snack bag, put the cookie in his bag or checked the plaintiff's snack bag before staff delivered it to him. The plaintiff relies entirely on his own belief that Streekstra was responsible for his snack bag on June 14, 2021 because she was working that day. But the plaintiff's unsubstantiated assertion that Streekstra prepared his snack bag cannot create a genuine dispute of fact sufficient to defeat summary judgment

because he has presented no evidence that he had personal knowledge about who personally prepared his snack bag that day. <u>See</u> <u>Cambronero</u>, 2023 WL 4946724, at *2; <u>Ammerman</u>, 817 F. App'x at 268; <u>see also</u> Fed. R. Civ. P. 56(c)(4) and Fed. R. Evid. 602.

The plaintiff asserts that the number of times he received a peanut butter packet suggests a pattern of errors that adds up to an Eighth Amendment violation. But as the court explained above, there is no evidence that any defendant is personally responsible for these mis-deliveries of peanut butter or peanut-containing items to the plaintiff. Only Streekstra regularly checked snack bags before delivery, and she avers that she never saw a peanut-containing item in the plaintiff's snack bag. Boushka and Davis only occasionally checked the plaintiff's snack bags, and they never personally witnessed a peanut butter item in his bag. As the court explained in the order screening the plaintiff's original complaint, the defendants cannot be held responsible as supervisors for the occasional errors of incarcerated workers or staff who may have been unfamiliar with the plaintiff's food allergy or incorrectly prepared his snack bag. <u>See</u> Dkt. No. 11 at 6 (citing Dkt. No. 7 at 5 (citing cases)).

The undisputed evidence shows that Food Service staff (including the defendants) and RHU staff instituted several measures to protect incarcerated persons with food allergies from receiving improper foods, including several additional measures specific to the plaintiff in response to his complaints about receiving peanut butter or peanut-containing food items: they place a tag on

snack bags listing the recipient's food allergies; they randomly checked the plaintiff's snack bags before they left the Food Service Department; they added a tag to the plaintiff's cell door to alert RHU staff to his peanut allergy; they implemented additional checks of the plaintiff's snack bags and meal trays by staff on his unit and even in front of his cell door to ensure he did not receive improper items; they created a special exception to a rule prohibiting persons incarcerated in the RHU from having clear plastic bags and ordered *only the plaintiff* to receive his meal bags in clear plastic bags so staff could more easily see the contents of his meal bags before delivering them to the plaintiff; and they ordered Food Service workers to place SunButter cups directly against the clear plastic bags so staff could immediately see that the plaintiff was receiving SunButter cups and not peanut butter packets.

Rather than showing deliberate indifference to the plaintiff's peanut allergy, this evidence shows that Waupun staff—including the defendants— made efforts to accommodate his food allergy and keep him from receiving and consuming peanut butter or peanut-containing items. The defendants' multifaceted approach to address the plaintiff's peanut allergy refutes the plaintiff's claim that they disregarded and were deliberately indifferent to his peanut allergy. See Rasho, 22 F.4th at 711 (holding that prison officials who "took multiple reasonable steps to fix [a] complex problem . . . cannot have been deliberately indifferent"). Even if the defendants could have done more to address the plaintiff's complaints of receiving improper food items, they were not required to do more to avoid liability. Id. (noting that even if prison officials

"could have done more to address" a specific problem, "their failure to pursue additional options does not amount to deliberate indifference"); Rosario v. Brawn, 670 F.3d 816, 821–22 (7th Cir. 2012) (noting that officials may "escape liability even if they did not take perfect action").

It is unfortunate that, on occasion, the plaintiff has received a peanut-containing item, and that at least once, he suffered an allergic reaction after consuming a cookie that may or may not have contained peanuts/peanut butter. But these occasional occurrences do not prove that the defendants were deliberately indifferent to his peanut allergy. See Peate, 294 F.3d at 882. At most, they prove that on occasion, staff may have made mistakes when preparing the plaintiff's snack bag or may have accidentally given the plaintiff a peanut-containing item. There is no evidence that any of the defendants are personally responsible for those accidents or mistakes. Even if there were, the court explained in the screening order that accidents amount only to negligence, which does not violate the Constitution. Dkt. No. 11 at 7 (citing Dkt. No. 7 at 5; Farmer, 511 U.S. at 835–36; and Chapman v. Keltner, 241 F.3d 842, 845 (7th Cir. 2001)); see also Estelle, 429 U.S. at 105 ("An accident, although it may produce added anguish, is not on that basis alone to be characterized as wanton infliction of unnecessary pain."). Mistakes by prison officials, even repeated mistakes, are not alone enough to violate the Eighth Amendment. See Kupsky v. Conda, Case No. 21-CV-1451, 2022 WL 309367, at *2 (E.D. Wis. Feb. 2, 2022) (citing cases for the proposition that "mistakes, inadvertent errors, negligence, [and] gross negligence . . . are not cruel and

43

unusual punishment within the meaning of the Eighth Amendment"); <u>Shesler</u>
<u>v. Sanders</u>, Case No. 13-CV-394, 2014 WL 5795486, at *8 (W.D. Wis. Nov. 6,
2014) (noting that "simple repeated mistakes" are not "enough to show that [an
official] acted with deliberate indifference").

There is a dispute over whether the plaintiff himself might be responsible
for at least some of the occasions on which he complained about having a
peanut butter packet. Davis avers in her declaration that unit staff reported the
plaintiff for manipulating new, untrained or "infusion" staff from a different
institution working at Waupun into giving him peanut butter packets. Dkt. No.
31 at ¶15. Davis concedes that she could not confirm these reports. <u>Id.</u> at ¶16.
The plaintiff avers that he "cannot bribe staff to give [him] food items [he is]
allergic to, due to [his] meals are checked in 'RHU' before its giving [*sic*] to
[him], plus a tag comes along with [his] allergies," which he has received since
2020. <u>Id.</u> at ¶93. But this dispute is immaterial. The plaintiff's own assertion
concedes that his meals are checked in RHU before he receives them and that
there is a tag identifying his allergies, and Davis avers that she implemented
additional measures (the tag on the plaintiff's cell door, delivering the plaintiff's
meals in clear plastic bags) to resolve the issue with new and infusion staff.
The plaintiff insists it was Officer Stoffol, not Davis, who put the tag on the
plaintiff's cell door sometime in 2020. That dispute, too, is immaterial.
Regardless of who put the tag on the plaintiff's door, it further shows that
Waupun staff knew about the plaintiff's food allergy and did not disregard it
but instead took extra measures to address it.

The undisputed evidence would not allow a reasonable jury to find that any defendant was aware of the plaintiff's peanut allergy and was deliberately indifferent to it. The defendants are entitled to summary judgment as a matter of law on the plaintiff's Eighth Amendment claim.[4]

### 2. *The Plaintiff's Other Arguments*

The plaintiff raises numerous irrelevant topics in his declaration. The court will discuss only some of them and explain why they are not relevant to his Eighth Amendment claim or the defendants' motion for summary judgment.

The plaintiff first claims that each defendant committed perjury by lying in their responses to his discovery requests and/or in their declarations in support of the motion for summary judgment. He cites information requests from before June 14, 2021 that he says show that the defendants were aware before that date of his complaints about receiving peanut butter or peanut-containing items in his snack bag. But the defendants did not say in their responses to the plaintiff's discovery requests that they did not hear from or respond to the plaintiff before June 14, 2021; they said they *did not recall whether* they knew about the issue or responded to the plaintiff's information requests about it. That the defendants do not recall receiving an information request over two years earlier is not evidence that they committed perjury.

_____

[4] The defendants argued that if the court declined to grant summary judgment in her favor, they were entitled to qualified immunity. Dkt. No. 74 at 24-26. "Where a defendant 'wins on the facts, [she] does not need qualified immunity.'" Sierra-Lopez v. County, Case No. 17-cv-1222, 2019 WL 3501540, at *10 (E.D. Wis. July 31, 2019) (quoting Viero v. Bufano, 925 F. Supp. 1374, 1387 (N.D. Ill. 1996); and Antepenko v. Domrois, Case No. 17-cv-1211, 2018 WL 6065347, at *6 (E.D. Wis. Nov. 20, 2018)).

Similarly, there is no evidence that Davis lied when she told the plaintiff she was unaware of his diet before she began as Food Service Administrator on June 7, 2021. The fact that she had worked at Waupun in other capacities before 2021 does not necessarily mean she would have known about the food allergies of all persons incarcerated at Waupun years earlier. And the plaintiff says in his declaration that he was at other institutions in 2018 and 2019 before arriving at Waupun in November 2019.[5] Davis would not have known about the plaintiff's food allergies in 2017 because he was not yet incarcerated at the institution where she worked. Her statement that she learned about his food allergies when she returned to Waupun in June 2021 is not evidence that she lied or committed perjury in her declaration.

The plaintiff also asserts that the defendants lied about whether Food Service is open on the weekends. The court explained above that the defendants' statements in their responses to the plaintiff's requests for admission were not inconsistent. But even if they were inconsistent, the plaintiff does not explain how the issue of which days Food Service was open is relevant to his Eighth Amendment claim. He claims he had an allergic reaction to a cookie he ate on June 14, 2021. The court takes judicial notice that June 14, 2021 was a Monday. See Fed. R. Evid. 201(b); Smith v. County of Racine, Case No. 05-C-871, 2007 WL 2570435, at *2 n.6 (E.D. Wis. Aug. 31, 2007) (citing Wright v. Farmers Nat. Grain Corp., 83 F.2d 666, 666 (7th. Cir. 1936)).

---

[5] The Wisconsin Department of Corrections Offender Detail website shows that the plaintiff was not incarcerated at Waupun before November 8, 2019. See https://appsdoc.wi.gov/lop/home/home (DOC # 463024).

Boushka avers that Food Services prepares snack bags the same day they are distributed during the week because that is when Food Services is open. That means the plaintiff's snack bag containing the allegedly peanut butter cookie likely was prepared on Monday, June 14, 2021, the same day he received the snack bag. The plaintiff presents no evidence suggesting otherwise.

The plaintiff submitted declarations from other incarcerated persons at Waupun. He does not explain the relevance of any of these declarations beyond their suggestions that Waupun served peanut butter in white cups—which the court addresses below. Ewing says nothing about peanuts or peanut butter being served at Waupun. Jones avers that the "majority" of desserts have peanut butter. But he says nothing about what the plaintiff received, he does not say whether there were non-peanut butter dessert alternatives given to persons with peanut allergies and he does not aver that he ever personally witnessed a special diet tray that contained an improper item. Keepers says that he saw chefs or supervisors prepare diet trays, but he does not say when this occurred or whether he saw staff *improperly* prepare a diet tray or snack bag. None of these declarations name the defendants or add any information to the plaintiff's claim against them.

The plaintiff avers that Waupun serves peanut butter scooped into a little white cup. He claims that he received these cups on occasion, including in November 2019 when he suffered his first allergic reaction to peanut butter. He does not say whether he received a cup of peanut butter at any time in 2021. Jones and Ozuna aver in their declarations that Waupun occasionally served

peanut butter this way; Jones says this occurred sometime after November 2022, but Ozuna does not say when or how often he received these cups of peanut butter since 2016. Neither Jones nor Ozuna say whether the plaintiff or any incarcerated person with a peanut allergy received a cup of peanut butter. The defendants aver that Waupun did not serve peanut butter scooped into white cups, it was served only in individually sealed packets. That means there is a dispute whether Waupun served cups of peanut butter to incarcerated persons, but this dispute is not material and does not foreclose summary judgment. The amended complaint does not allege that the plaintiff received cups filled with peanut butter or that other incarcerated persons received cups with scooped peanut butter. It alleges that the plaintiff received peanut butter or peanut-containing *items* in his snack bag, including an alleged peanut butter cookie that caused his allergic reaction on June 14, 2021. The information requests and complaints that the plaintiff filed before June 14, 2021 complain that he received peanut butter packets, peanut butter bars or other peanut-containing items. Nowhere in his complaints or requests does the plaintiff mention receiving a cup of scooped peanut butter. Whether Waupun served cups of scooped peanut butter is not relevant to the plaintiff's claim that he improperly received peanut butter packets, bars or cookies in his snack bag.

The plaintiff attached information requests he sent to Waupun staff in August 2023 asking whether incarcerated persons housed in the RHU could have plastic bags. Waupun staff responded and confirmed that persons housed in RHU were not allowed to have plastic bags. Davis avers in her declaration

that she asked that Food Service staff use clear plastic bags to avoid improper food items being served to incarcerated persons. She also attached an email from 2022 reminding Food Service staff that "that RHU does NOT get plastic bags. EXCEPT FOR [THE PLAINTIFF]. All others are in paper bags." Dkt. No. 31-2 (all caps in original). This suggests that the institution made a special exception to its plastic bag policy for the plaintiff because of his repeated complaints about receiving peanut butter. This is yet another example of efforts that institution staff took to prevent the plaintiff from receiving peanut butter or peanut-containing items and to assist staff in identifying these items for removal before providing food to the plaintiff. It does not suggest that the defendants—or any institution staff—were deliberately indifferent to the plaintiff's peanut allergy.

The plaintiff asserts that incarcerated workers in the RHU are not allowed to take or exchange items from an incarcerated person's meal tray or snack bag. The court infers this is in response to Boushka's statement that incarcerated workers might have swapped out an item in a snack bag, resulting in the plaintiff getting a peanut butter packet after the snack bag left Food Service. But the fact that incarcerated workers are not allowed or supposed to exchange or take items from meal bags does not mean it does not happen. Both parties' statements on this issue are mere speculation, and the caselaw holds that that speculation is not evidence that can either support or defeat a motion for summary judgment. The court affords little weight to these statements about other incarcerated persons taking or exchanging items from the

plaintiff's snack bag. Even if these exchanges occurred, the court has detailed all the mechanisms and protective measures that the defendants and Waupun staff took to protect the plaintiff from receiving peanut-containing items. There is only so much the defendants could do, and they cannot be liable for not preventing every occurrence of the plaintiff receiving a peanut butter packet or peanut-containing item. See Rasho, 22 F.4th at 711; Peate, 294 F.3d at 882.

The plaintiff repeatedly asserts that the defendants did not acknowledge his food allergy to raisins until 2023. But the plaintiff is not proceeding on a claim that the defendants provided him raisins. Nor is he proceeding on a claim about the defendants providing him grapes, fish or any other food to which he is allergic. His claims in this case relate only to his allergy to peanuts or peanut butter. His allergies to foods other than peanut or peanut butter are not relevant to this case or to the defendants' motion for summary judgment.

The plaintiff also repeatedly asserts that there was tension between Food Service staff and RHU staff that created a "hostile" environment. But he does not say whether the defendants were involved in these disagreements or issues. Nor does he explain what relevance these staff issues have to him receiving peanut butter items or to his claims that the defendants (in food service, not the RHU) were deliberately indifferent to his food allergy.

Finally, the court has recounted that the plaintiff avers that he could not "bribe" staff to give him food items to which he is allergic because staff checks his food trays and meal bags up to three times before he receives them. He describes this as "a process." This statement is in response to Davis's averment

that the plaintiff might *manipulate* staff into giving him peanut butter items by telling new staff or workers who are not familiar with him and his food allergies that he is on a hunger strike and needs food. Davis did not suggest that the plaintiff bribed anyone and the plaintiff has not disputed that he manipulated staff into giving him peanut butter packets. Again, perhaps more important is the fact that the plaintiff's own description of the "process" of receiving his meals bags or food trays demonstrates the lengths to which Waupun staff have gone to avoid him receiving food items to which he is allergic. The plaintiff's own declaration suggests that Food Service staff not only are aware of his food allergies but that they have implemented extra measures to avoid him getting items to which he is allergic. This extra effort does not suggest that anyone at Waupun, including the defendants, is deliberately indifferent to his peanut allergy; it suggests that Waupun staff are hyperaware of, and vigilant to protect, the plaintiff because of his food allergies. The evidence would not allow a reasonable jury to reach any other conclusion.

## III. Motions for Sanctions (Dkt. Nos. 46, 60, 64)

The court received the plaintiff's first motion for sanctions on September 25, 2023. Dkt. No. 46. In this motion, he alleges that Boushka lied in his declaration because Bouschka says that Waupun does not serve peanuts, yet later avers that Waupun does serve peanut desserts or other peanut-containing items. Id. at 2. The plaintiff alleges that Boushka also lied about his job duties and about whether the plaintiff had written to him before June 14, 2021. Id. The plaintiff alleges that Davis committed perjury when she stated in her

declaration that she did not recall the plaintiff writing to her, but then stated that the plaintiff did, in fact, write to her. Id. at 3. He says she also lied about her job duties and about when she learned about the plaintiff's food allergies. Id. The plaintiff alleges that Streekstra lied in her responses to the plaintiff's interrogatories and requests for admissions regarding whether the plaintiff wrote to her, whether Waupun serves peanuts and when she learned about the plaintiff's allergy. Id. at 4–5. The plaintiff seeks unspecified "expense's for sanctions and attorney fee's" because he spent "3 and a half hours putting th[e] motion togather [*sic*], despite working other civil case's including this one." Id. at 6.

The defendants respond that none of the cited conduct justifies sanctions or entitles the plaintiff to fees or expenses. Dkt. No. 51. The defendants point out that Boushka did not aver that no peanut-based desserts are served; he said only that Waupun does not serve peanut cookies in snack bags. Id. at 1 (citing Dkt. No. 29 at ¶36). They assert that Boushka's statement about his job duties is consistent with what he said in response to the plaintiff's discovery requests. Id. at 1–2. The defendants assert that Davis consistently said that no one contacted her about the plaintiff's allergy until July 14, 2021,[6] but that she may have been contacted after that date. Id. at 2 (citing Dkt. No. 31 at ¶¶6, 13). The defendants assert that Streekstra, like Boushka, consistently has averred that although she could not recall when the plaintiff made her aware of his

---

[6] The court believes this is a typo, and that the defendants meant to refer to *June* 14, 2021, when the plaintiff suffered his allergic reaction.

allergies, she was aware of them during the relevant times in 2021. Id. (citing Dkt. No. 50 at ¶¶6–7).

The plaintiff filed two briefs replying to the defendants' response and reiterating the allegations in his motion. Dkt. Nos. 54, 56. The second reply brief reminds the court that the defendants filed Streekstra's declaration late. Dkt. No. 56 at 3. The plaintiff says he disputes this declaration, and he reiterates that Streekstra "also lied under perjury in her interrogatories and admissions." Id.

The plaintiff filed his motion under Federal Rule of Civil Procedure 56(h). Under Rule 56(h), if the court is "satisfied that an affidavit or declaration is submitted in bad faith or solely for delay," the court "after notice and a reasonable time to respond . . . may order the submitting party to pay the other party the reasonable expenses . . . it incurred as a result" or otherwise appropriately sanction the submitting party. Fed. R. Civ. P. 56(h).

The court has explained why many of the plaintiff's contentions that the defendants lied or committed perjury do not have merit. The defendants are not committing perjury when they state that they do not recall the plaintiff writing to them about his food allergies but that they were able to find those correspondences when preparing their declarations in this lawsuit. People can truthfully say they do not recall something occurring, even if they later find evidence that it did occur. That is what the defendants say happened here. Similarly, Boushka avers that Waupun does not serve peanuts—that is, bags or cups of peanuts themselves—but admits that Waupun serves items that

*contain* peanuts, such as peanut butter bars or peanut butter in packets. He

avers that Waupun does not serve peanut butter *cookies*, but that it does serve

other peanut butter desserts. These statements are not "semantics" (as the

plaintiff says in his declaration), they are not inconsistent and they are not a

basis for concluding that Boushka lied about the kinds of foods that Waupun

serves.

The court also has explained above why Davis's statements about her

work history and when she learned about the plaintiff's allergies are not

inconsistent. Davis worked at Waupun from 2017 to 2019 when the plaintiff

was incarcerated elsewhere. She left Waupun and was working at another

institution when the plaintiff arrived at Waupun in November 2019. She had

no reason to learn about his food allergies during the time he was not

incarcerated at Waupun. It follows that she would not have learned about his

food allergies until after she returned to Waupun and became its Food Service

Administrator in June 2021. There is no evidence that Davis could have, would

have or should have learned about the plaintiff's food allergies sooner.

The plaintiff repeatedly asserts that the defendants lied about their job

duties. In response to the plaintiff's requests for admissions, Boushka denied

that part of his job was "to make sure snack bag's [*sic*] are fixed correctly" or

"to make sure that diet meal's [*sic*] are fixed correctly." Dkt. No. 45 at 9. He

also denied that he "fixed" the plaintiff's meals in 2021 and that he supervised

diet meals being made in 2021. <u>Id.</u> at 12. In his declaration, Boushka describes

his job duties as including "preparing meals, specialized diets, assuring proper

food preparation for on-line and off-line food service feeding, ordering and maintaining food and non-food items and inventory . . . supervising staff and inmate workers" and other duties. Dkt. No. 29 at ¶3. Davis similarly denied that part of her duty "as a supervisor is to make sure diet meals are fixed correctly." Dkt. No. 45 at 23. But she admitted that she occasionally would "check special diets/allergy snack bags for accuracy." Id. In her declaration, she says the "Institution Food Service Department" generally "is responsible for the preparation, distribution and service of meals and medically ordered modified diets for inmates." Dkt. No. 31 at ¶3. She says that as Food Service Administrator, she was "responsible for supervision of staff and inmates, implementation of a Modified Diet Program" and other duties. Id.

The court can understand why the plaintiff believes the defendants' discovery responses are inconsistent with their declarations. The plaintiff broadly asked if Boushka checked meal trays or snack bags, and Boushka denied that he did. But he then said that his job duties included "preparing meals" and "assuring proper food preparation." It is not inconsistent for Boushka to say he did not check *all* meal trays, special diets and snack bags before they were delivered to the recipients, yet to also say that his job duties included the *general* supervision of Food Service workers and preparation of meals. Davis's answers were more specific, explaining that she did not generally ensure that diet meals were fixed correctly but did on occasion check snack bags for accuracy. It might have been more helpful for all parties to be more specific in their discovery requests and responses to discovery. But the

court cannot conclude that these answers were submitted in bad faith or were meant to mislead the plaintiff or the court or to delay the proceedings.

The court twice received the plaintiff's identical second motion for sanctions on November 6 and 9, 2023. Dkt. Nos. 60, 64. This second motion alleges that the defendants lied about peanut butter not being served in a cup at Waupun. Dkt. No. 64. The plaintiff says that on October 31, 2023, he wrote to Boushka because he received SunButter in a container and not in its usual single-serve cup. Id. at ¶1. He says Boushka responded the next day that SunButter "was only available in bulk," so the institution now must serve it in a cup. Id.; Dkt. No. 64-1 at 1. Boushka assured the plaintiff that his "meal comes in a bag via Diet area so it does not mix with P.B." Dkt. No. 64-1 at 1. The plaintiff claims that this contradicts the defendants' statements in their declarations that peanut butter is not served as a scoop in a cup and is served only in sealed packets. Dkt. No. 64 at ¶2. He also asserts that he received peanut butter crackers in September 2023, which he says contradicts the defendants' statements that Waupun does not serve peanuts or peanut butter cookies. Id. at ¶3. The plaintiff again seeks unspecified "attorney fee's and sanctions expenses" because it "took [him] 2 – 2½ hours to put this motion with evidence together [sic]." Id. at 3–4.

The defendants respond by pointing to Boushka's response to the plaintiff's complaint about the scooped SunButter. Dkt. No. 75. They explain, as Boushka did, that only SunButter was served in cups (peanut butter was

not), and that the plaintiff's food is prepared in the diet area to avoid contamination with peanuts. Id. (citing Dkt. No. 64-1 at 1).

The plaintiff's second motion for sanctions is frivolous. Boushka told the plaintiff that the institution had to serve SunButter in a cup because it was provided only in bulk. There is no evidence that *peanut butter* also has been served in white cups or that the plaintiff received a cup of peanut butter. The plaintiff's own complaint about the issues says that he received "sunbutter in a container with sunbutter writ[t]en on it." Dkt. No. 64-1 at 1. He does not say that he received peanut butter. As the court explained above, neither the amended complaint nor the plaintiff's institutional complaints allege that the plaintiff received cups of scooped peanut butter in 2021. This issue is irrelevant to the plaintiff's lawsuit, and it is not a basis for sanctions.

The plaintiff's complaint about receiving peanut butter crackers fares no better. He insists that because he received peanut butter *crackers* on one occasion in September 2023, Boushka lied about the institution providing him peanut butter *cookies* in 2021 and about serving peanuts to any incarcerated person. Crackers are not cookies. Neither cookies nor crackers are peanuts. The defendants concede that Waupun serves peanut-containing items, which could include the crackers that the plaintiff mistakenly received. There remains no evidence that the institution also serves peanuts or peanut-butter cookies.

In neither of the plaintiff's motions for sanctions does he request a specific or valid monetary amount. He seeks attorney's fees, but he has no attorney. He requests reasonable expenses, but he does not say what expenses

he incurred. He says it took him hours to write each motion, which time he needed to work on his other civil cases. But the plaintiff's first motion for sanctions merely reiterates the same allegations of perjury that the plaintiff repeatedly included in his response brief, his response to the defendant's proposed findings of fact, his own proposed facts and his declaration. All he had to do to prepare this motion was copy his allegations into this new document. The plaintiff's second motion for sanctions is frivolous. The fact that he spent time working on meritless motions is not a reason to grant sanctions.

The court reminds the plaintiff that it granted his requests for extensions of his deadlines to file his response to the defendants' motions for summary judgment in *all* his pending cases. In this case, the court extended his deadline from July 31 to August 30, 2023, extended it again to October 31, 2023 and set a final deadline of November 13, 2023, to give the plaintiff additional time to respond to Streekstra's declaration. Dkt. Nos. 36, 41, 58. The court granted that final extension even after it told the plaintiff it would grant him no further extensions. It was the plaintiff's decision to litigate multiple civil cases at the same time. He is not entitled to expenses because of that choice.

The court cannot conclude that any defendant submitted their declaration or their responses to the plaintiff's discovery requests in bad faith or for purposes of delay. The plaintiff has offered no valid basis for sanctioning the defendants or awarding him fees or expenses. The court will deny his motions for sanctions.

## IV. Conclusion

The court **DENIES** the plaintiff's motions for sanctions. Dkt. No. 46, 60, 64.

The court **GRANTS** the defendants' motion for summary judgment. Dkt. No. 26.

The court **DISMISSES** this case. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing *in this court* a notice of appeal within **30 days** of the entry of judgment. See Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. R. App. P. 4(a)(5)(A). If the plaintiff appeals, he will be liable for the $605 appellate filing fee regardless of the outcome of the appeal. The plaintiff has accumulated three strikes so he cannot proceed on a case in federal court (except a petition for *habeas corpus* relief) without prepaying the full filing fee unless he demonstrates that he is in imminent danger of serious physical injury. See Fed. R. App. P. 24(a)(1). The plaintiff may be assessed another "strike" by the Court of Appeals if it concludes that his appeal has no merit.

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under

Rule 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2). Any motion under Rule 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 31st day of March, 2024.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**